IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

GILLIAN VAN DIEN,

                Plaintiff,

v.

STATE OF WISCONSIN DEPARTMENT OF HEALTH SERVICES,

                Defendant.

OPINION and ORDER

20-cv-252-jdp

---

Plaintiff Gillian Van Dien held three different jobs for the Wisconsin Department of Health Services between 2016 and 2019. After she failed her performance reviews for the first two jobs, the department reassigned her. After she failed her performance review for the third job, the department terminated her. Van Dien is suing the department under the Rehabilitation Act, contending that any problems with her performance were the result of the department's failure to provide reasonable accommodations for her migraines.

The department moves for summary judgment, contending that Van Dien failed to adequately perform the essential functions of her jobs despite numerous reasonable accommodations that the department provided her. Van Dien contends that the department failed to reasonably accommodate her, but her position cannot be squared with the evidence. The department adjusted both her work schedule and the light levels in her work areas. Despite these accommodations, her performance and attitude were poor, and she adduced no evidence that the department's concerns were merely pretextual. The court will grant the department's motion for summary judgment.

UNDISPUTED FACTS

The following facts are undisputed.

Gillian Van Dien was first diagnosed with migraines in 2013, but her symptoms were relatively mild for the first three years. She began working for the Wisconsin Department of Health Services in May 2016, and she began experiencing migraines "almost immediately" after she was hired. Dkt. 25, ¶ 3. She worked for the department as a disability determination specialist from May 2016 until May 2017, as a purchasing agent from July 2017 until July 2018, and as a disability associate from August 2018 until September 2019, when the department terminated her.

The main issues in this case involve Van Dien's job performance and the department's attempts to accommodate Van Dien. The court will describe in some detail Van Dien's experiences in each job before turning to the parties' arguments.

A. **Disability determination specialist**

Van Dien was hired as a disability determination specialist in May 2016. She was responsible for making initial determinations on applications for disability benefits, among other things. Her first 12 months were a probationary period, and her first three months were primarily training.

In October 2016, Van Dien submitted her first request for an accommodation. Specifically, she asked the department to provide her with cubicle shields to mitigate the brightness of the workplace lights because the lights "may trigger" a migraine headache. Dkt. 16-2, at 11. In November 2016, the department discussed the issue with Van Dien, and the department decided to accommodate Van Dien by trying to find a different workspace with reduced lighting. The department allowed Van Dien to try several other workspaces. She

2

declined several workspaces because they still allowed too much light into her visual field. But she accepted an alternative workspace in December 2016.

Around the same time, Van Dien received her first performance review. The department gave her a rating of "solid performance" for customer service, decisionmaking, and interpersonal relationships and a rating of "needs improvement" for communication. The review also noted that Van Dien was not meeting her production goals, completing only 170 cases when the expectation was to complete 250. Overall, the department gave Van Dien a rating of "does not meet expectations" and advised her that she would need to complete 350 cases by the end of her probationary period. Van Dien objected to the "needs improvement" rating, but she didn't respond to the comments about her productivity.

In February 2017, Van Dien asked the department for an extension of her probation, which was scheduled to end in May 2017. She wrote that her migraines had "slowed [her] learning process." Dkt. 16-2, at 40. Her current workspace "helped considerably with the frequency of the migraines," and she didn't "feel [that] further workplace accommodations" were necessary. *Id.* But she had already fallen behind in her work by the time she received a new workspace, and she believed that an extension of her probation would allow her to catch up.

In March 2017, the department sent Van Dien a questionnaire to be forwarded to her doctor. In response to a question whether an extension of probation would help Van Dien meet her productivity requirements, the doctor said that she didn't know. In response to a question whether a suspension of new case assignments for a three-week period would be sufficient, the doctor wrote, "This seems reasonable." Dkt. 12-1, at 3. At the end of March 2017, the

department suspended Van Dien's intake of new cases until May 1, 2017, to allow her to address a backlog of 37 cases.

In May 2017, Van Dien received another performance review, and the department found that her overall performance "does not meet expectations." She received a "needs improvement" rating for processing cases because her average time for completing a case increased from 58 days to 82 days since her last review and more than 22 percent of her cases were more than 100 days old. She received a rating of "does not meet expectations" for increasing her productivity because she was completing only two to five cases a week rather than the expected eight to ten cases. Overall, she had completed 189 cases, many fewer than necessary to meet expectations. In the comments, the department noted that she "ha[d] not shown significant improvement" in her productivity since November 2016 and that "Bureau goals and budgets are directly related to meeting case processing expectation," so an employee's productivity is "weighed heavily in the overall expectations for successfully completing" the probationary period. Dkt. 25, ¶ 46. Van Dien did not provide any responsive comments to the review.

After the review, the department determined that Van Dien could not perform the disability determination specialist job, even with a reasonable accommodation, so she would be transferred to a new position. The department sent another questionnaire to Van Dien's doctor to help determine an appropriate placement. The doctor wrote that Van Dien could perform "considerable work on the computer along with other reading and writing tasks" if she received an accommodation of "limited intensity overhead fluorescent lights." *Id.*, ¶ 53.

## B. Purchasing agent

In July 2017, the department transferred Van Dien to a purchasing agent position. Van Dien's responsibilities included ensuring compliance with state procurement regulatory requirements, performing purchasing support services for staff, and providing technical assistance to program area staff in developing procurement transactions.

In September 2017, Van Dien asked the department to move her start time from 8 a.m. to 8:30 a.m., "with 15–20 minutes of flexibility." Dkt. 25, ¶ 63. In response to a department questionnaire, Van Dien's doctor wrote that an 8:30 a.m. start time was needed for "improved sleep" and "may reduce the frequency of headaches," but that the additional 15–20 minutes would be needed only once or twice a month. Dkt. 12-1, at 10. In October 2017, the department approved an 8:30 start time but said that Van Dien would need to use medical leave for arrivals later than that.

A few days later, Van Dien asked the department to move her start time to 9 a.m., writing that her migraines "impede[] her ability to get to work at times" if she is experiencing nausea or a visual disturbance. Dkt. 16-2, at 131. In response to a department questionnaire, Van Dien's doctor wrote that a 9 a.m. start time would allow her to arrive on time, and 15–20 minutes of flexibility would not be needed. In November 2017, the department approved a 9 a.m. start time. Van Dien arrived after 9 a.m. 17 times from November 13 to December 27, 2017.

Also in November 2017, Van Dien received her first performance review in the purchasing agent position. The department rated her performance as "solid," noting that her work was "carefully and consistently completed." Dkt. 25, ¶ 86.

In February 2018, Van Dien asked the department for "15-20 minutes of flexibility in arrival time after 9:00 a.m. one to two days per week and leave from work up to a maximum of 1-2 days per episode, up to 2 episodes per month." *Id.*, ¶ 87. That request was inconsistent with the earlier questionnaire response of Van Dien's doctor, so the department required Van Dien to submit to an independent medical examination. After the examination, the doctor wrote that he "know[s] of no clinical or medical basis for problems with migraines related to getting up early in the morning," and that "[t]he issues [Van Dien] claims to have specifically in the mornings . . . are lifestyle related and not clinically related to the migraine development. She simply does not want to come to work earlier, based on the totality of her discussion on the subject." Dkt. 16-2, at 162–63. Based on the doctor's evaluation, the department denied Van Dien's request.

On March 15, Van Dien asked for a start time of 9:30 a.m. On March 20, she asked for a start time of noon on one day a week, preferably on Monday, and a start time of 9:30 a.m. the rest of the week. On March 21, the department denied this request, relying on the independent examination and the statements of Van Dien's own doctor.

On March 30, Van Dien informed the department that she was experiencing an increase in her symptoms, including visual disturbances that affected her ability to see and interfered with her ability to complete work tasks. In response, the department prepared a questionnaire for Van Dien's doctor, but the doctor didn't respond for several weeks. In April 2018, the department placed Van Dien on leave while it conducted a disciplinary investigation related to tardiness and an inaccurate time sheet. In an April 25 response to the questionnaire, Van Dien's doctor wrote that her condition affected her vision, and he recommended a flexible work schedule, extra time to arrive in the morning, and a half-day once a week. The department

6

informed Van Dien that it would "re-engage in the accommodation process" when Van Dien returned to work. Dkt. 16-2, at 193. Van Dien told the department that her primary accommodation request was to be transferred back to her previous position. The parties don't say when Van Dien returned to work, but the department concluded the investigation on May 22, 2018, and decided not to take any disciplinary action against Van Dien.

In July 2018, Van Dien received another performance review. The department gave Van Dien an overall rating of "does not meet expectations," finding that she did not perform work in a timely manner, was overly reliant on peers, did not make independent decisions, became argumentative with her supervisors, did not accept feedback, resisted directives, fixated on unimportant issues, failed to show a commitment to improving, and did not exhibit a positive attitude. The department provided detailed comments discussing numerous examples, including the following:

- When Van Dien's supervisor provided her with a new process for performing "tax certification updates," Van Dien responded by saying that she was "explicitly trained" not to do what the supervisor said. Two weeks later, she had not implemented the new process. When the supervisor followed up, Van Dien said she would comply but that she would "issue[] [a] disclaimer" to her coworkers that the new process hadn't worked before. When the supervisor told Van Dien that she should talk to a supervisor when she has a problem, Van Dien said that "her point of view is not being received and that she has an obligation to assert it."

- When Van Dien was having trouble logging into her computer, her supervisor directed her to use another available computer so that she could focus on getting her work done for the day. Instead, Van Dien focused on the computer issues, failed to complete her work, and failed to respond for two days to an email her supervisor sent her about that work.

- Van Dien failed to meet a deadline for a grant application.

- Van Dien focused too much on "systems issues" with a program called WISBuy instead of focusing on getting her work done, even after supervisors directed her to focus on training and let other staff work on the systems issues. In response

7

to that directive, Van Dien said she was told not to ask for help with WISBuy. This led to delays in completing her work.

- When Van Dien's supervisor told her to consult with a coworker about complying with an open records request, Van Dien responded that she hadn't handled such a request before and she thought it was complicated. She was later unable to demonstrate the steps she took to resolve the request.

- Van Dien argued with her supervisor about how to handle another open records request.

- When Van Dien was asked to update a contract, she sent the request to other staff, stating, "I don't know how to do this, will need someone to show me." She later stated that a coworker had previously shown her how to complete the task, but she failed to take notes.

Dkt. 16-1, at 60–70.

Van Dien provided 16 pages of comments in response to the performance review, including the following:

- Van Dien was "involuntarily placed into the reassignment process," and the purchasing agent position "is not one that [she] would have ever applied for."

- The department unreasonably denied her requests for a later start time.

- Her supervisor made "very extreme, false, and pejorative . . . assumptions" that Van Dien was "deliberately disregarding" the established schedule.

- The department engaged in "unfounded character assassination."

- The department "wasn't concerned with fulfilling its obligations under the ADA."

- The conclusions of "an FMLA second opinion evaluation" were "completely fraudulent," and the department was "hostile, coercive, and made multiple attempts to violate" Van Dien's rights during the process.

- The department's actions related to Van Dien's medical condition were "consistently illegal" and made in "bad faith."

- Van Dien's supervisor acted in a "Kafkaesque way" by accepting coworker complaints about her at "face value" and then accusing her of being "argumentative" when she asked for more information.

8

- Van Dien's supervisor demonstrated "chronic hostility, criticism, and a failure to acknowledge others' mistakes."

- The supervisor's allegation that Van Dien didn't take ownership of her work or responsibility for her actions demonstrated the supervisor's "chronic disparagement" and was "a projection of her own actions and failures."

- The supervisor was "known throughout the office" as "frenetic" and a "micromanager."

- Van Dien's failure to meet a deadline was "partially due" to the department's "FMLA violations" and "partially due to increased symptoms as a result of their pretextual piling on."

- Van Dien's supervisor was "completely unconcerned" with Van Dien's "development at work" but instead created a "power struggle" where Van Dien "couldn't do anything but completely and abjectly agree with her or be mischaracterized."

- The supervisor's use of the word "fixation" was "comically inaccurate" and "very illustrative of her pathologizing at every opportunity."

- The supervisor "inaccurately labeled as 'argumentative' any expression of anything but complete submission."

- A coworker was "hypersensitiv[e]" and "attention seeking" to the level that it was a "clinical issue."

Dkt. 16-1, at 72–88.

Shortly after the performance review, the department terminated Van Dien from the purchasing agent position for failing to meet probationary standards.

A few days later, the department denied Van Dien's request to return to her previous position, writing that Van Dien wasn't qualified for the position, with or without an accommodation. Van Dien made the same request on July 31, and the department denied it for the same reason, writing, "Putting you back in that position where you were not able to demonstrate satisfactory performance with or without a reasonable accommodation is not

9

reasonable, regardless of the recommendation of your physician." But the department also wrote that it would be compiling a list of vacant positions for possible transfer.

**C. Disability associate**

In August 2018, Van Dien accepted a transfer to a position as a disability associate. Van Dien's responsibilities included reviewing and processing all incoming and outgoing mail and preparing case files for adjudication.

From September 2018 to May 2019, Van Dien requested accommodations related to both her schedule and the lighting at work. She asked for the following accommodations related to her schedule at different points in time:

- a schedule of 9 a.m. to 4:30 p.m. on Thursday and 9 a.m. to 5:45 p.m. the rest of week;

- a start time of 9:30 a.m on Monday through Thursday and 11:30 a.m on Friday, "with the ability to make up that time";

- a schedule of 9:30 a.m. to 7 p.m. every day; and

- the ability to have "intermittent lateness to work."

As for the requests for a later start time, the department wrote: "Your job duties have been modified so you will not be required to participate in the weekly rotation to receive the morning mail delivery at 8:00am. As a result you will perform 2 consecutive weeks of receiving the afternoon mail delivery at approximately 1:00pm." Dkt. 16-2, at 225. The parties don't say whether the accommodation meant that Van Dien had a later start time, or whether Van Dien was satisfied with the accommodation. In response to the request for "intermittent lateness," the department wrote: "A FMLA certification was provided on 4/1/2019, this request will be reviewed under the accommodation process if it is not covered under FMLA." Dkt. 16-2, at 282. Neither side explains what that means or whether Van Dien was satisfied with the

accommodation. As for the other scheduling requests, the department wrote that department policy "restricts flextime to 7am to 6pm" and that flextime was not available during training.

Van Dien requested the following accommodations related to lighting:

- removal of the light over her cube or an additional cube shield;
- specialized glasses for computer work;
- turning off three banks of lights behind her workstation;
- limited time in the mail room because the machine was loud and the lights were too bright; and
- a change in her workspace to the second floor, where there was a lower level of lighting.

The department denied the request for a move to the second floor on the ground that it would make it more difficult to confirm Van Dien's presence at her workstation. But the department offered the following accommodations instead:

- The bank of lights in her work area would be dimmed by turning one switch off and supplemental desk lighting would be provided in her cubicle, if requested.
- She was authorized to wear a hat to help further block or reduce light.
- She was moved to a cubicle workspace not directly located along the windows of the first floor.
- She was provided with a light shield.
- The light bulb immediately above her cubicle workspace was removed.
- Her duties related to the mail machine were removed.

The department approved the use of special glasses, but the department declined to pay for them because they were a "personal item."

In April 2019, Van Dien asked the department for additional cube shields and dimming of the lights behind her workspace. She wrote that light exposure "has affected the speed and

11

accuracy of my work." Dkt. 16-2, at 283. In response, the department said that it was ordering additional cube shields and "the light in the hallway behind [Van Dien] has been turned off." *Id.* at 286.

In May 2019, Van Dien sent the department a note from her doctor that "it is medically recommended that Ms. Van Dien be moved to a work area with lower overall ambient lighting or that the light immediately behind her work space be removed." In response, the department wrote that it was not changing its decisions regarding lighting accommodations.

In September 2019, the department conducted a performance evaluation, rating Van Dien's overall performance as "does not meet expectations." The department's comments included the following:

- Since February 2019, the department had documented 44 procedural errors that Van Dien had made. Her work generally had a high error rate.

- Van Dien had "continued responding to her supervisor in a blunt or negative manner when receiving feedback." As an example, the department cited an email in which Van Dien was responding to her supervisor's observations about recent errors Van Dien made when conducting an electronic case review. Van Dien wrote that "a 4% error rate is probably to be expected" after "50 cases on a late Friday afternoon," and she asked when she could "expect to be off review altogether for electronic cases." In another example, after a supervisor pointed out an error, Van Dien said that the error was "an anomaly." She wanted to know about the errors her coworkers were making because she believed that she was being "consistently singled out for greater scrutiny" and that she was being "unjustly and personally attacked." She discussed what she described as a "major error" that a coworker had made. She also alleged that she wasn't receiving adequate accommodations.

- Van Dien had "not been successful with building relationships" with coworkers or management. As an example, the department cited an email in which Van Dien had complained that a coworker had taken some work off her desk to make sure it got done. Van Dien said that she didn't believe the work was time-sensitive, and she wanted to avoid a situation where she is "criticized or negatively evaluated" for not doing her work. As another example, the department cited an email in which Van Dien wrote that the department "continues to cause me harm in setting up these unnecessary difficult situations" in response to a directive from her supervisor.

- Van Dien "continues to take significantly more time than the expected time to complete mail deliveries."

- Van Dien had "not shown the ability to obtain solid performance ratings for production and quality simultaneously, nor has she been able to sustain the solid performance level. Because of her quality issues, [her] opportunities to assume other duties, including error queue maintenance, has been limited."

Dkt. 16-1, at 94–114. In response to the review, Van Dien wrote, "Another substantial work of fiction to be addressed at my discretion." She offered no substantive comments.

On September 19, 2019, the department gave Van Dien a "notice of medical separation," finding that Van Dien wasn't qualified to perform the disability associate job without or without a reasonable accommodation, for the reasons stated in the performance review.

ANALYSIS

Van Dien contends that the department violated the Rehabilitation Act by terminating her because of her disability and by failing to give her reasonable accommodations. These claims overlap substantially. To prevail on either claim, Van Dien must show that she is disabled within meaning of the statute, that the department was aware of that disability, that she was "qualified" for the job in question, and that the employment program of which her job was a part received federal financial assistance. *Conners v. Wilkie*, 984 F.3d 1255, 1260–61 (7th Cir. 2021); *Whitaker v. Wisconsin Dep't of Health Servs.*, 849 F.3d 681, 684 (7th Cir. 2017). A failure-to-accommodate claim has the additional element that the employer failed to provide a reasonable accommodation. *Conners*, 984 F.3d at 1261. A discrimination claim has the additional element that the plaintiff was discharged or subjected to another adverse action "solely" because of her disability. *Whitaker*, 849 F.3d at 684.

13

The parties provided little medical evidence about the severity or frequency of Van Dien's migraines, but there is no dispute that her migraines qualify as a disability under the Rehabilitation Act. It is also undisputed that the department was aware of Van Dien's disability and that the department receives federal funding. But the department contends that Van Dien wasn't qualified for any of three positions that she held with the department, that it provided reasonable accommodations for Van Dien in all three jobs, and that it terminated her because she wasn't performing up to expectations rather than because of her disability. The department is entitled to summary judgment if it shows that there are no genuine issues of material fact, that is, that no reasonable jury could find that Van Dien has satisfied the disputed elements of her claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[1]

The questions whether Van Dien was "qualified," whether she was meeting the department's expectations, and whether the department was providing reasonable accommodations are related. This is because the term "qualified" means two things in the context of the Rehabilitation Act. First, the plaintiff must have the basic qualifications required for the position, such as educational prerequisites, employment experience, skills, or licenses. *Conners*, 984 F.3d at 1261. The department doesn't challenge Van Dien's qualifications in this respect. Second, the plaintiff must be able to perform the essential functions of the job, without or without a reasonable accommodation. *Id.*

---

[1] Van Dien says that summary judgment is a "drastic remedy," Dkt. 21, at 9, but that is not the view of the Supreme Court. Rather, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The department contends that Van Dien failed to perform the essential functions of each of the three jobs, although it doesn't say whether that failure was the result of Van Dien's migraines or for some other reason. But the department doesn't necessarily have to determine why Van Dien wasn't meeting expectations. "[W]hen the evidence demonstrates that an employee is incapable of performing the job, the employer need not isolate the disability-related causes for an employee's inferior performance from problems that stem from a poor attitude, insubordination, [or] carelessness." *Garg v. Potter*, 521 F.3d 731, 736–37 (7th Cir. 2008) (internal quotation marks omitted). In either situation, the key question is whether the plaintiff can show that she could have performed the job adequately if she had received a reasonable accommodation that the employer refused to provide. *Id.* at 736–37.

There is no genuine dispute that Van Dien failed to perform the essential functions of each of the jobs she had with the department. The critical question is whether Van Dien has evidence that a reasonable accommodation would have enabled her to perform any of those jobs.

For the disability determination specialist position, it is undisputed that Van Dien fell far short of her productivity goals and that processing cases in a timely manner was an essential function of her job. Van Dien blames her low productivity on the department's delay in providing a workspace with appropriate lighting and its refusal to extend her probation so that she could catch up. But she doesn't support that view with evidence. The department gave Van Dien a workspace with reduced lighting in December 2016, and Van Dien doesn't identify any other modifications that she needed for her workspace after that. She acknowledged that the new workspace "helped considerably with the frequency of the migraines," and she didn't "feel [that] further workplace accommodations" were necessary, with the exception of the probation

15

extension. Dkt. 16-2, at 40. But she cites no evidence that her performance improved after December 2016, even when the department stopped giving her new cases for several weeks. Rather, it's undisputed that her productivity *fell* between November 2016 and May 2017: her average time to complete a case rose from 58 days to 82 days. And when the department sent a questionnaire to Van Dien's doctor, she said that she didn't know whether an extension would be helpful but that a temporary suspension of new cases "seem[ed] reasonable."

So it isn't reasonable to infer that giving Van Dien an extension of her probation would have enabled Van Dien to perform the essential functions of her job. The department was entitled to remove Van Dien from that position and to deny Van Dien's later request to return to a position that she had been unable to successfully perform.

As for the purchasing agent position, many of the department's concerns with Van Dien's performance had little to do with her migraines or even her productivity. Rather, the criticisms in Van Dien's performance review were primarily about what the department perceived to be her poor attitude: she was argumentative, she didn't take feedback well, and she resisted directions. Van Dien denies that she was difficult, but she cites no evidence that the department was fabricating its criticisms as a pretext for animus against her disability or that it didn't honestly believe the criticisms, which is all that matters. *See Monroe v. Indiana Dept. of Transportation*, 871 F.3d 495, 505 (7th Cir. 2017). To find evidence supporting the department's decision, one need look no further than Van Dien's own 16-page response to her performance review, which is replete with examples of the concerns with Van Dien's attitude identified in that review. Regardless, Van Dien doesn't identify any way that a reasonable accommodation would address the department's concerns, so she hasn't raised a genuine issue

of material fact on the question whether she was qualified to perform the purchasing agent position.

As for the disability associate position, the department's concerns were largely the same as they were for the purchasing agent: Van Dien had a negative attitude, didn't accept feedback, and failed to demonstrate a commitment to improve. The department also had concerns about the quality of Van Dien's work, which Van Dien says was the result of the department's failure to provide reasonable accommodations for her. But the undisputed facts show that the department provided numerous lighting and scheduling accommodations for Van Dien while she was in the disability associate position. She didn't get everything she wanted, but that's not the standard. *Brunker v. Schwan's Home Service, Inc.*, 583 F.3d 1004, 1009 (7th Cir. 2009) (employer not required to provide employee's "ideal" accommodation). Rather, it is Van Dien's burden to show that the department's accommodations weren't reasonable and that the additional accommodations she requested would have enabled her to perform the essential functions of her job. *See Stern v. St. Anthony's Health Ctr.,* 788 F.3d 276, 289 (7th Cir. 2015); *Mays v. Principi*, 301 F.3d 866, 871 (7th Cir. 2002).

Van Dien vaguely states in her brief that the department was too slow in responding to her accommodation requests and that it shouldn't have denied others. But she doesn't explain why any particular accommodation was unreasonable, why any particular refusal was unreasonable, how any refusal to accommodate was connected to a particular performance issue, or how an additional accommodation would have enabled her to perform her job effectively. By failing to develop an argument on these issues, Van Dien has forfeited them. *See Cloutier v. GoJet Airlines, LLC*, 996 F.3d 426, 450 (7th Cir. 2021).

Van Dien also blames the department for failing to engage in an interactive process after May 2019. "[W]hen an employee asks for an accommodation because of a disability, the employer must engage with the employee in an interactive process to determine the appropriate accommodation under the circumstances." *Kauffman v. Petersen Health Care VII, LLC*, 769 F.3d 958, 963 (7th Cir. 2014). This argument fails because it's undisputed that Van Dien didn't make any accommodation requests after May 2019.

Van Dien may mean to contend that the department should have approved additional accommodations after her doctor "medically recommended" in May 2019 that Van Dien be "moved to a work area with lower overall ambient lighting or that the light immediately behind her work space be removed." But the doctor provided the department with no new information. At that point, the department had already moved Van Dien to a different location and reduced the lighting in her workspace. Neither Van Dien nor the doctor explained how those accommodations were unreasonable. So the department's failure to engage in further discussion didn't violate the Rehabilitation Act. *See Rehling v. City of Chicago*, 207 F.3d 1009, 1016 (7th Cir. 2000) ("[Federal disability law] seeks to ensure that qualified individuals are accommodated in the workplace, not to punish employers who, despite their failure to engage in an interactive process, have made reasonable accommodations.").

Even if the court assumed that additional accommodations could have helped with the quality of her work, Van Dien provides no evidentiary connection between her disability and the department's perception that she had a poor attitude, which was a significant part of the negative performance review that led to her termination. That's important because "[t]he Rehabilitation Act has a stricter causation requirement [than the American with Disabilities Act]: the plaintiff's disability must be the sole reason for the alleged discriminatory action; this

18

contrasts with the ADA, which requires only that the plaintiff's disability be a reason for the challenged action." *Conners,* 984 F.3d at 1260; *see also Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 484 (7th Cir. 2019) ("[T]he Rehabilitation Act prohibits discrimination only if it is 'solely by reason of' a person's disability. The ADA permits mixed-motive claims."). So even if the department terminated Van Dien in part because of performance defects related to her migraines, the undisputed facts show that the department's decision wasn't motivated *solely* by those defects.

The bottom line is that Van Dien hasn't adduced evidence from which a reasonable jury could find that the department failed to provide a reasonable accommodation or that the department terminated Van Dien solely because of her disability in violation of the Rehabilitation Act. The court will grant the department's motion for summary judgment.

ORDER

IT IS ORDERED that the Wisconsin Department of Health Services' motion for summary judgment, Dkt. 13, is GRANTED. The clerk of court is directed to enter judgment in favor of the defendant and close this case.

Entered July 9, 2021.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge